UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------X
SANDRA PEREZ-RODRIGUEZ,

                    Petitioner,

                                        **MEMORANDUM AND ORDER**

          - against -
                                         10 Civ. 9346 (NRB)

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                    Respondent.
-------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


     Sandra Perez-Rodriguez ("plaintiff" or "claimant")
brings this action pursuant to Section 205(g) of the Social
Security Act, 42 U.S.C. § 405(g), challenging the final
decision of the Commissioner of Social Security
("Commissioner") to deny her application for Supplemental
Security Income ("SSI") benefits. Both parties have moved
for judgment on the pleadings pursuant to Federal Rule of
Civil Procedure 12(c). For the reasons set forth below, we
remand the case for a new administrative hearing.

                         **BACKGROUND**[1]

     Plaintiff applied for SSI benefits on June 17, 2008,
claiming that she was disabled due to various physical and
mental conditions. (Tr. 101-104.) The application was

---

[1]  Unless otherwise indicated, all facts are drawn from the
administrative record filed by the Commissioner as part of his answer
("Tr").

denied administratively on October 8, 2008, and plaintiff subsequently requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 51-58.) The hearing was held on February 3, 2010 before ALJ Seth I. Grossman. (Tr. 24-47.) In a June 10, 2010 decision, the ALJ found that plaintiff was not disabled and thus not eligible for SSI benefits. (Tr. 6-23.) Plaintiff appealed the ALJ's decision, and on October 18, 2010, the Social Security Appeals Council denied plaintiff's request for review, rendering the Commissioner's decision final. (Tr. 1-5.) Plaintiff filed the instant action on December 15, 2010.

## I.   Non-Medical History

Plaintiff was born in 1971 in Puerto Rico. (Tr. 32, 101.) Plaintiff suggests that she left Puerto Rico in 2007 with her three children to flee an abusive husband. (Tr. 32, 222.) She further asserts that as a child in Puerto Rico, she was raped repeatedly by her two older brothers. (Tr. 224-226.)

Plaintiff graduated high school in Puerto Rico but has limited ability to speak and understand English. (Tr. 32-34.) She previously worked as a cashier and a manicurist in Puerto Rico but has not worked since arriving in the United States in 2007. (Tr. 37, 41, 156.)

## II.  Medical History

### A. Physical Conditions

#### 1. Dr. Nader Hanna

Between January 2008 and April 2008, plaintiff was treated by Dr. Nader Hanna for pain and numbness in her hands. (Tr. 122.) On January 18, 2008, Dr. Hanna performed nerve conduction studies on plaintiff that "reveal[ed] evidence of a moderate bilateral nerve neuropathy at the wrist." (Tr. 173-176.) Dr. Hanna noted that this finding was consistent with a clinical diagnosis of Carpal Tunnel Syndrome. (Tr. 174.)

On March 18, 2009, Dr. Hanna completed a medical assessment form at the request of the Social Security Administration. (Tr. 196-201.) Dr. Hanna indicated on the form that plaintiff could never lift or carry up to ten pounds. (Tr. 196.) With respect to plaintiff's right hand, Dr. Hanna indicated that plaintiff could never handle, finger, push, or pull, and could only occasionally reach and feel. (Tr. 198.) With regard to plaintiff's left hand, Dr. Hanna wrote that plaintiff could never handle, push or pull, could occasionally finger, feel, and reach overhead, and could frequently reach otherwise. (Tr. 198.) Dr. Hanna also wrote that plaintiff could sort, handle, and use paper and files. (Tr. 201.) Finally, Dr. Hanna assessed that

plaintiff could sit for eight hours in a workday and stand and walk for five hours in a workday, but while plaintiff could sit for eight hours continuously, she could only stand and walk for two hours continuously. (Tr. 197.)

### 2. Dr. William Lathan

On August 8, 2008, Dr. William Lathan performed a consultative physical examination of plaintiff. (Tr. 213-216.) Dr. Lathan found that plaintiff had full range of motion of her shoulders, elbows, forearms, and wrists bilaterally, and that she had strength of 5/5 in her upper and lower extremities and grip strength of 5/5 bilaterally. (Tr. 215.) Dr. Lathan also found that plaintiff had a moderate restriction for repetitive grasping and hand and wrist motion with her right hand. (Tr. 215.)

### 3. Dr. Lorenza Freddo

Since at least May 2009, plaintiff has been treated by Dr. Lorenza Freddo, a neurologist at St. Barnabas Hospital. (Tr. 39, 269.) On May 26, 2009, Dr. Freddo ordered an MRI to test for the possibility that plaintiff suffered from multiple sclerosis. (Tr. 269.) The MRI, along with an additional subsequent test, ruled out this possibility. (Tr. 269-272.)

On February 8, 2010 – after the hearing before the ALJ but before the ALJ's ruling – Dr. Freddo completed a

4

medical source statement concerning plaintiff. (Tr. 277-282.) Dr. Freddo wrote that plaintiff had been diagnosed with reflex sympathetic dystrophy ("RSD"). (Tr. 282.) Dr. Freddo assessed that plaintiff is unable to sort, handle, or use paper and files, but he declined to complete the other areas of the form regarding plaintiff's physical capabilities, stating that these assessments should be made "by physical therapy." (Tr. 277-282.)

### 4. <u>Dr. David Marshak</u>

On three occasions between January 2010 and April 2010, plaintiff was treated by Dr. David Marshak, a physician in the pain management anesthesia department of St. Barnabas Hospital. (Tr. 283-291.) Dr. Marshak's treatment notes indicate that plaintiff suffers from RSD and that prior attempted treatments had proven ineffective. (Tr. 284-289.) In addition, Dr. Marshak's notes from two of plaintiff's visits rate her level of pain as a "9" and a "10" respectively on a scale from 1 to 10. (Tr. 284, 287.) Dr. Marshak's April 2010 notes indicate that plaintiff had declined an IV lidocaine/ketamine infusion treatment because she preferred to first try physical therapy. (Tr. 289.)

### 5. <u>Occupational Therapy</u>

The Union Community Health Center conducted an initial evaluation of plaintiff on April 21, 2010 and determined that plaintiff should receive occupational therapy twice a week for a period of six to eight weeks. (Tr. 293.) The treatment was to consist of "hot/cold pack, manual therapy, therapeutic exercise, therapeutic activities, pain management and HEP." (Tr. 293.)

### B. <u>Mental Conditions</u>

#### 1. <u>Fordham Tremont Community Health Center</u>

In early 2008, plaintiff visited the emergency room of St. Barnabas Hospital several times due to feelings of depression. (Tr. 179-192.) Plaintiff was referred to the Fordham Treatment Community Health Center (the "Center"), where she received treatment between March 2008 and November 2008. (Tr. 193-195, 221-243.)

Upon plaintiff's initial visit to the Center, the treating clinician assessed plaintiff to be depressed with "anxiety, sleep disturbance, [and] suicidal ideation." (Tr. 228.) In a subsequent psychiatric evaluation, Dr. Luis C. Ang assigned plaintiff a Global Assessment Functioning score of 55, which reflects "[m]oderate symptoms (e.g., flat affected and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or

school functioning (e.g., few friends, conflict with peers or coworkers)." (Tr. 233.)

Plaintiff was also treated at the Fordham Tremont Center by Maria Kumagay, a social worker. Kumagay would later complete a medical source statement at the request of the Social Security Administration. In that statement, Kumagay indicated that plaintiff has no impairment in her ability to understand, remember, and carry out simple instructions or in her ability to make judgments on simple work-related decisions. (Tr. 193.) Kumagay assessed that plaintiff has "moderate" impairment with respect to her ability to perform these tasks for complex instructions or decisions. (Tr. 193.) Kumagay concluded that plaintiff would have "mild" limitations in her ability to interact with the public, supervisors, or co-workers as well as in her ability to respond appropriately to usual work situations and changes in a routine work setting. (Tr. 194.)

## 2. Dr. Dimitri Bougakov

On August 8, 2008, Dr. Dimitri Bougakov performed a consultative psychiatric evaluation of plaintiff. Dr. Bougakov assessed that plaintiff can follow and understand simple instructions and can perform simple tasks independently, but he noted that her recent and remote

memory skills were mildly impaired. (Tr. 210.) Dr. Bougakov
opined that the results of the examination "appear to be
consistent with some psychiatric problems, but in itself,
this does not appear to be significant enough to interfere
with the claimant's ability to function on a daily basis."
(Tr. 210.) Dr. Bougakov added that plaintiff's psychiatric
problems appeared to be under control with her current
treatment, which included prescribed medication. (Tr. 210.)

### 3. <u>Dr. Z. Mata</u>

On October 1, 2008, Dr. Z. Mata, a non-examining
psychiatrist, assessed plaintiff's mental condition based
on a review of her medical record. (Tr. 244-257, 264-266.)
Dr. Mata expressed the belief that plaintiff is "moderately
impaired" in her ability to understand, remember, and carry
out detailed instructions but is not significantly impaired
with respect to other cognitive capabilities. (Tr. 264-
266.) Dr. Mata concluded that "[plaintiff] retains the
residual functional capacity to perform entry level work
activities on a sustained basis." (Tr. 266.)

## III. <u>ALJ Hearing</u>

With the aid of an interpreter, plaintiff testified at
the hearing before the ALJ on February 3, 2010. The ALJ
first questioned plaintiff concerning her ability to speak
English. Plaintiff indicated that although she took English

language courses in high school, she could not carry out a basic conversation in English or understand and fill out a job application in English. (Tr. 33-34.) When asked whether she could understand - as opposed to carry out - a basic conversation in English, plaintiff stated that she could do so "[m]ore or less." (Tr. 33.) The ALJ further probed whether plaintiff could read and understand the New York Post, to which plaintiff responded, "One or the other. Sometimes I confuse a word with another." (Tr. 33.)

The ALJ next questioned plaintiff concerning her physical capabilities. Plaintiff stated that she could not carry a gallon of milk with her right hand, but she could carry a half gallon of milk with that hand over the length of the room in which the hearing was being held.[2] (Tr. 36.) As for her left hand, plaintiff stated that she could carry heavy objects for up to a half-hour. (Tr. 36.) The ALJ asked plaintiff to specify for how many pounds she could do so, and plaintiff responded, "Five, ten, twelve." (Tr. 36.) The ALJ then asked plaintiff whether she had any trouble walking, to which she responded, "No." (Tr. 36.)

The ALJ also briefly questioned plaintiff about her psychological conditions. Plaintiff stated that she had trouble concentrating on matters, as she would sometimes

---

[2] A gallon of milk weighs approximately 8.6 pounds.

9

forget why she was at a location and would have to think for ten to fifteen minutes to recall why she was there. (Tr. 36-37.)

The only other person to testify at the hearing was vocational expert Raymond Cestar. The ALJ presented the following hypothetical profile to Cestar:

> [A]ssume a person of claimant's background. She's a high school graduate. She can understand – carry on a basic conversation in English. She can read simple forms. She can make out forms and job applications and such but no complicated reading in English . . . . Assume she could do the full range of light work except that she can only lift and carry 12 pounds . . . . And simple repetitive tasks. So light – the full range of light where except that she's limited to 12 pounds and simple, repetitive tasks.

(Tr. 42-43.) Cestar stated that such a person could return to work as a manicurist. (Tr. 43.) The ALJ then modified the hypothetical to add that the person could not do repeated tasks with her right hand. (Tr. 43.) Cestar replied that under the new hypothetical profile, the person could not return to work as a manicurist. (Tr. 43) However, Cestar expressed the belief that such a person could serve as an usher, a school crossing guard, a school bus monitor, or a surveillance monitor. (Tr. 43.)

After Cestar provided the descriptions of these positions, the following dialogue ensued between the ALJ and Cestar:

Q. Are there other light jobs she can do besides the one you referenced based on the hypothetical, is that about it?

A. You're talking about lifting 12 pounds with her right hand, is that correct?

Q. Well, with both hands she can lift the 12.

A. I think that probably –

Q. That would be it. Okay. That's it. Fine, fine. Now, if she was limited to five pounds could she do the first three jobs?

A. No.

Q. So the only job would be surveillance monitor?

A. That's correct.

(Tr. 44.) Cestar later added that "to do unskilled, sedentary work does require bilateral use of the hands." (Tr. 44.)

## DISCUSSION

Before addressing the merits of the parties' motions, we summarize the legal standards applicable to review of SSI claims, and we recount the ALJ's opinion in detail.

I.   **Statutory and Regulatory Framework**

A. **Standard of Review**

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." Burgess v.

<u>Astrue</u>, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks omitted). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Id.</u> (internal quotation marks omitted); <u>see also</u> 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

A court may affirm, modify or reverse the Commissioner's decision with or without remanding the case for a hearing. 42 U.S.C. § 405(g).

**B. <u>Five-Step Analysis</u>**

The Social Security Act provides that a person is entitled to disability benefits when he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security regulations establish a five-step analysis to determine whether a claimant is eligible for such benefits. <u>See</u> 20 C.F.R. § 416.920(a)(4); <u>see also</u> <u>Berry v. Schweiker</u>, 675 F.2d 464, 467 (2d Cir. 1982).

At the first step, the Commissioner must consider whether the claimant is currently engaged in substantial gainful activity, defined as work involving "significant physical or mental activities . . . [done] for pay or profit." 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1572(a)-(b); 404.1520(a)(4)(i). A finding of such activity is a threshold disqualification for SSI benefits.

If no such activity is found, the Commissioner next considers whether the claimant has a "severe impairment," which is defined as an impairment that significantly limits the claimant's physical or mental ability to perform basic work activities and that is expected to last at least twelve months. 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii).

If the claimant is so impaired, the third step requires the Commissioner to determine, based solely on the medical evidence, whether the step two impairment meets or equals any of the impairments listed in 20 C.F.R. § 404, Subpt. P, app. 1 ("Appendix 1"). If so, disability is presumed. 20 C.F.R. § 404.1520(a)(4)(iii). If no such finding is made, the Commissioner must proceed to the fourth step to determine whether the claimant is able to perform her past relevant work.

Before this determination can be made, the Commissioner must assess the claimant's RFC. The RFC is

defined as the individual's maximum ability to do work activities "on a regular and continuing basis" despite her physical and mental limitations.[3] 20 C.F.R. § 404.1545(b). "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." <u>Melville v. Apfel</u>, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996). In undertaking the RFC analysis, the Commissioner may consider "all of the relevant medical and other evidence," including the claimant's daily activities, opinion evidence concerning the claimant's limitations, and subjective symptoms such as pain. 20 C.F.R. §§ 404.1512(b), 404.1545(a)(3).

Once the RFC assessment is made, the Commissioner evaluates the exertional demands of the claimant's previous work based on the claimant's description of the work, expert testimony of vocational experts, and the Department of Labor's Dictionary of Occupational Titles. 20 C.F.R. § 404.1560(b)(2).

If the claimant is determined to be unable to perform her previous work, the fifth and final step requires the Commissioner to determine whether there is other work in the national economy the claimant is able to perform. The

---

[3] Relevant physical capabilities include sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, and traveling. 20 C.F.R. § 404.1513(c)(1).

Commissioner considers the claimant's limitations and vocational factors such as education, age, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). Ordinarily, this determination may be made by resorting to medical vocational guidelines, commonly called "the grids." See Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986); 20 C.F.R. Pt. 404, Subpt. P, App. 2. If, however, the grids do not "adequately reflect a claimant's condition" because the claimant's nonexertional impairments further restrict her possible work beyond the range reflected in the grids, the Commissioner must consider vocational expert testimony or similar evidence to determine whether jobs exist in the national economy for a person with the claimant's individual limitations. Bapp, 802 F.2d at 605-06. The claimant is deemed disabled only if he or she "cannot make an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(v).

For each of the first four steps, the claimant bears the burden of proof. Petrie v. Astrue, 412 F. App'x 401, 404 (2d Cir. 2011). However, if the analysis reaches step five, "the Commissioner then has the burden of proving that the claimant still retains a [RFC] to perform alternative substantial gainful work which exists in the national economy." Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999)

15

(internal quotation marks and alterations omitted).

## II.  The ALJ's Findings

At step one, the ALJ determined that plaintiff had not engaged in substantial gainful activity since June 17, 2008, the date on which she filed her application for SSI benefits. (Tr. 14.)

At step two, the ALJ found that plaintiff has the following severe impairments: (a) RSD causing bilateral hand pain (more severe on the right hand) and bilateral knee pain; (b) memory problems; and (c) depressive disorder. (Tr. 14.) Proceeding to step three, the ALJ found that these impairments are neither listed in Appendix 1 nor medically equivalent to any impairment that would automatically qualify for disability benefits. (Tr. 14.)

Before proceeding to step four, the ALJ assessed plaintiff's RFC. The ALJ noted plaintiff's testimony that she could lift a half-gallon of milk with her right hand and up to twelve pounds with her left hand. The ALJ then turned to the opinions submitted by Dr. Hanna, one of plaintiff's treating physicians. The ALJ rejected the majority of Dr. Hanna's assessments, particularly the determinations that plaintiff could never lift or carry up to ten pounds with either hand and that plaintiff could never handle, push, or pull with either hand. (Tr. 17.) The

ALJ explained that he was rejecting the opinions of this treating physician on the ground that the assessments were inconsistent with plaintiff's own testimony concerning the loads she could carry, as well as with the findings of Dr. Lathan, who found that plaintiff has only "moderate" restrictions for repetitive grasping and hand and wrist motion with her right hand. (Tr. 17.)

Turning to plaintiff's psychological conditions, the ALJ found no evidence that plaintiff's depression is as severe as the degree alleged. The ALJ reached this conclusion based on the assessment of Kumagay, plaintiff's social worker, and the consultative psychiatric evaluation performed by Dr. Bougakov. (Tr. 17-18.) The ALJ also found that the evidence contradicted plaintiff's claim that she suffers from severe lapses in memory. (Tr. 18.) In this regard, the ALJ relied on Dr. Bougakov's assessment that plaintiff has only "mildly impaired" memory skills that are possibly related to symptoms of anxiety. (Tr. 18.) The ALJ concluded that plaintiff "has been able to perform the mental demands of work at all times relevant to this decision." (Tr. 18.) The ALJ reached this conclusion despite acknowledging Kumagay's assessment that plaintiff has "moderate limitations" in understanding, remembering,

and carrying out complex instructions and in making
judgments on complex decisions. (Tr. 17-18.)

Based on all of these factors, the ALJ found that
plaintiff has the RFC "to perform a wide range of light
work as defined in 20 C.F.R. 416.967(b) but is limited to
lifting and carrying up to twelve pounds; no repetitive
movements with the right hand; simple tasks; and limited to
basic conversation and reading in English."[4] (Tr. 15.)

The ALJ then proceeded to step four to determine
whether plaintiff was able to return to her past employment
as a cashier or manicurist. Relying on the opinions of the
vocational expert Cestar, the ALJ determined that plaintiff
could not return to her past work. (Tr. 18.)

Finally, at step five, the ALJ found that significant
jobs exist in the national economy that plaintiff is able
to perform. (Tr. 19-20.) The ALJ reached this conclusion
exclusively based on the answers given by Cestar when
presented with the hypothetical profile constructed by the
ALJ. As previously referenced, the available jobs listed by

---

[4] "Light work" is defined to involve lifting no more than twenty pounds
at a time with frequent lifting or carrying of objects weighing up to
ten pounds. 20 CFR § 416.967(b).

Cestar were usher, school crossing guard, school bus monitor, and surveillance monitor.[5] (Tr. 19.)

## III. **Review of the ALJ's Findings**

Plaintiff challenges the ALJ's step-five determination that she is able to perform work available in the national economy and the RFC analysis underlying this conclusion. Plaintiff's makes four arguments in attacking the ALJ's findings: (1) the ALJ failed to properly develop the record by failing to obtain plaintiff's complete medical history; (2) the ALJ did not properly credit plaintiff's subjective reports of pain; (3) the ALJ unjustifiably rejected or ignored the opinions of plaintiff's treating physicians Dr. Hader and Dr. Freddo; and (4) the hypothetical questions posed to Cestar omitted significant limitations of plaintiff and contained assumptions not supported by substantial evidence. We address each of these claims below.

### A. **Completeness of Record**

Plaintiff contends that the ALJ failed to fulfill his duty to develop a complete medical history. Specifically, plaintiff points to the ALJ's having provided plaintiff

---

[5] Specifically, the ALJ relied on Cestar's testimony that there are: (1) 25,000 usher jobs in the national economy and 5,000 local usher jobs; (2) 42,000 national and 6500 local school crossing guard jobs; (3) 16,000 national and 1000 local school bus monitor jobs; and (4) 16,500 national and 1000 local surveillance monitor jobs. (Tr. 19.)

with medical assessment forms to turn over to three of her current physicians, thereby placing the burden on plaintiff to ensure that her physicians completed these forms. (Tr. 38-39.) Plaintiff notes that only one of the three physicians – Dr. Freddo – completed and returned the form. Plaintiff maintains that the ALJ should have taken more assertive measures, such as employing his subpoena power, to ensure that these physicians contributed their assessments to the record. (Mem. of Law in Supp. of Pl.'s Mot. for J. on the Pleadings ("Pl. Mem.") at 10.)

Under the five-step analysis, a claimant is responsible for providing medical evidence that demonstrates her impairment, its severity, and the attendant functional limitations. 20 C.F.R. § 404.1512(c). However, "because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." Burgess, 537 F.3d at 128 (internal quotation marks and alterations omitted).

The ALJ satisfied his duty here. The extensive record in this case contains evidence from the entire relevant period and beyond. See Thomas v. Barnhart, No. 01 Civ. 587 (GEL), 2002 WL 31433606, at *5 (S.D.N.Y. Oct. 30, 2002) (holding that in a Social Security case, the administrative

record is complete where it contains "extensive information on [claimant's] medical conditions covering the full period in dispute"). The record contains dozens of pages of treatment notes from physicians who saw plaintiff for her physical and mental conditions during the relevant period, and it contains formal assessments from three of plaintiff's treating practitioners and two physicians who provided consultative examinations. (Tr. 169-293.)

We further note that the ALJ was not required to employ his subpoena power. The use of subpoenas in social security proceedings is governed primarily by 20 C.F.R. § 416.1450(d), which provides, in pertinent part:

> When it is reasonably necessary for the full presentation of a case, an administrative law judge may, on his or her own initiative or at the request of a party, issue subpoenas for the appearance and testimony of witnesses and for the production of books, records, correspondence, papers, or other documents that are material to an issue at a hearing.

20 C.F.R. § 416.1450(d)(1). "The plain language of this section clearly places the decision to issue a subpoena within the sound discretion of the ALJ." Serrano v. Barnhart, No. 02 Civ. 6372 (LAP), 2005 WL 3018256, at *4 (S.D.N.Y. Nov. 10, 2005). Accordingly, the Second Circuit has determined that an ALJ's decision to issue a subpoena to an unresponsive party is discretionary. Yancey v. Apfel,

145 F.3d 106, 113 (2d Cir. 1998) ("[T]o accept, as a matter of law, that a disability claimant has an absolute right to subpoena a reporting physician would unnecessarily increase the financial and administrative burdens of processing disability claims while diluting the ALJ's discretion in how he develops the record."). Thus, we reject plaintiff's contention that the ALJ failed to properly develop the record with regard to obtaining assessments from the three physicians in question.

B. **Subjective Reports of Pain**

Plaintiff next contends that the ALJ failed to properly investigate and assess her reports of pain. (Pl. Mem. 16-18.)

Subjective reports of pain that are supported by objective medical evidence are entitled to "great weight." Simmons v. U.S. R.R. Ret. Bd., 982 F.2d 49, 56 (2d Cir. 1992) (internal quotation marks omitted). If a claimant's symptoms suggest a greater severity of impairment than can be demonstrated by objective medical evidence, the ALJ is to consider several evaluative factors, including the claimant's daily activities, any treatment the claimant has received, and the nature of the symptoms. See 20 C.F.R. § 404.1529(c)(3); see also Morganstein v. Chater, 111 F.3d

123 (2d Cir. 1997); <u>Villani v. Barnhart</u>, No. 05-CV-5503
(DRH), 2008 WL 2001879, at *10 (E.D.N.Y. May 8, 2008).

In her SSI application, plaintiff claimed to suffer
from severe bilateral hand pain and bilateral knee pain.
(Tr. 16.) In his decision, the ALJ indeed found that
plaintiff suffers such pain as a result of her RSD. (Tr.
14.) However, the ALJ then seemingly cast the issue aside
and focused his RFC analysis on plaintiff's testimony
concerning the weights she could carry. (Tr. 16-17.) The
neglect of this issue in the ALJ's decision is not a
surprise given that the ALJ failed to explore plaintiff's
pain during her testimony at the hearing.[6] Thus, the ALJ was
in no position to make credibility findings concerning
plaintiff's level of pain, and accordingly he did not do so
in his decision.

Even in the absence of applicable testimony, the ALJ
should have weighed the objective medical evidence in the
record that supports plaintiff's contention that she
experiences severe pain due to her conditions. For
instance, the ALJ should have considered Dr. Marshak's
treatment notes rating plaintiff's level of pain as a "9"
and a "10" on a scale from 1 to 10. Moreover, the ALJ

---

[6] While the ALJ did briefly ask plaintiff about her pain at the hearing,
he failed to ask any follow-up questions on the issue once plaintiff
reiterated that she experiences pain in her hands and knees and has
been diagnosed with RSD. (Tr. 34-35.)

should have discussed whether the mere fact that plaintiff has been diagnosed with RSD and Carpal Tunnel Syndrome is itself objective medical evidence that corroborates plaintiff's complaints of pain, at least to some degree.

If plaintiff's reports of pain were supported by objective medical evidence – as appears to be the case – the ALJ should have afforded these reports "great weight." Even if the ALJ did not believe that such deference was warranted, it is not clear that he properly considered the factors enumerated in 29 C.F.R. § 404.1529(c)(3). See Villani, 2008 WL 2001879, at *11. Thus, on remand, the ALJ should extensively question plaintiff concerning her symptoms of pain such that he has an adequate basis to assess her claims and determine whether those claims are consistent with the established medical evidence. The ALJ should then articulate in his decision the factors considered in assessing the reports of pain and make specific findings under the applicable framework. The ultimate determination on this issue should be factored into any reassessment of plaintiff's RFC.

## C. __Assessments of Treating Physicians__

Plaintiff contends that the ALJ also assigned insufficient weight to the opinions of Dr. Hanna and Dr.

Freddo - plaintiff's treating physicians. We again find merit to plaintiff's arguments.

Under the treating physician rule, "the opinion of a claimant's treating physician as to the nature and severity of [an] impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Burgess, 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(d)(2)). However, contradictory opinions of other medical experts, including consultative physicians, may constitute such substantial evidence that negates the need for controlling deference. Petrie, 412 F. App'x at 405.

If an ALJ chooses not to assign controlling weight to a treating physician's opinion, the ALJ must still consider an assortment of factors in deciding how much weight to assign the physician's assessment. Id. at 406. These factors include: (i) the frequency, length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the physician's opinion with the record as a whole; (iv) whether the treating physician is a specialist; and (v) other factors brought to the Social Security Administration's attention that support or contradict the

opinion. Id. at 406-07 (quoting Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004)); see also 20 C.F.R. § 404.1527(d).

Ultimately, "the ALJ must comprehensively set forth the reasons for the weight assigned to a treating physician's opinion." Newbury v. Astrue, 321 F. App'x 16, 17 (2d Cir. 2009) (internal quotation marks and alteration omitted).

Here, the ALJ chose not to afford controlling weight to the opinions of Dr. Hanna or Dr. Freddo. In fact, the ALJ did not even mention Dr. Freddo in his decision, let alone provide an explanation of the weight assigned – if any – to Dr. Freddo's assessment that plaintiff cannot sort, handle, or use paper and files. (Tr. 282.) The failure to provide "good reasons" for not crediting the opinion of a treating physician is itself a ground for remand. Burgess, 537 F.3d at 129-30. In reconsidering plaintiff's application, the ALJ must therefore decide whether to provide controlling weight to Dr. Freddo's opinion, and if he does not grant controlling weight, the ALJ must still consider the various factors described above in considering how much weight to afford Dr. Freddo's assessment. We note in this regard that Dr. Freddo is a specialist (a neurologist) who appears to have treated

plaintiff on a regular basis over a sustained period of time.

With regard to Dr. Hanna, the ALJ explained that he was not granting controlling weight to the doctor's opinions because those opinions were supposedly contradicted by plaintiff's testimony at the hearing as well as by the assessment of Dr. Lathan, the consultative physician. We find that the ALJ erred in this analysis as well.

Plaintiff's brief testimony concerning the loads she could carry was a thin reed on which to base a decision to not grant controlling weight to a treating physician – especially given that plaintiff's testimony concerning her right hand did not even contradict Dr. Hanna's assessments. The ALJ was similarly misguided in his reliance on Dr. Lathan's evaluation. After acknowledging Dr. Lathan's finding that plaintiff has "moderate" restrictions for repetitive grasping and hand and wrist motion with her right hand, the ALJ found that "Dr. Lathan's examination does not indicate that [plaintiff] has any other restriction rendering her unable to perform the demands of a light range of exertionally light work." (Tr. 17.) In essence, the ALJ took Dr. Lathan's silence on the issue of how much weight plaintiff can lift as an affirmative

refutation of Dr. Hanna's conclusions. Such an inference was entirely inappropriate. The Second Circuit has clearly held that the silence of a consultative physician on an issue pertinent to a claimant's RFC is not an appropriate basis on which to resolve that issue to the claimant's detriment. See Rosa, 168 F.3d at 81. ("This Court has refused to uphold an ALJ's decision to reject a treating physician's diagnosis merely on the basis that other examining doctors reported no similar findings." (citing Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 643 (2d Cir. 1983)).

The ALJ must therefore reconsider his decision to not afford controlling weight to Dr. Hanna's conclusions. If the ALJ still believes that controlling weight is not appropriate, he must articulate more specific and substantial considerations that support this decision. Furthermore, even if the ALJ decides not to grant controlling weight, he must thoroughly consider the factors enumerated in 20 C.F.R. § 404.1527(d) in determining the appropriate degree of deference to afford.[7] We note in this

---

[7] It would be particularly important for the ALJ to explore the frequency, length, nature, and extent of the treatment relationship between plaintiff and Dr. Hanna. See Petrie, 412 F. App'x at 405 (noting that the deference shown to a treating physician is due largely to "his unique position resulting from the 'continuity of treatment he provides and the doctor/patient relationship he develops'" (quoting Monguer v. Heckler, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983)).

regard that the ALJ failed to explore any of these factors in discussing Dr. Hanna's assessments in his previous decision.

### D. **Hypothetical Posed to Vocational Expert**

Plaintiff's final contention concerns the hypothetical questions posed to the vocational expert Cestar.

There must be substantial evidence in the record to support the assumptions upon which a vocational expert bases his opinion. See Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983). The ALJ must pose hypothetical questions that "reflect the full extent of the claimant's capabilities and impairments." Day v. Astrue, No. 09-131 (DRH), 2011 WL 1467652, at *16 (E.D.N.Y. Apr. 18, 2011) (quoting Sanchez v. Barnhart, 329 F. Supp. 2d 445, 449 (S.D.N.Y. 2004)). If a hypothetical question falls short of this standard, the vocational expert's response cannot constitute substantial evidence that supports a determination of no disability. Pardee v. Astrue, 631 F. Supp. 2d 200, 211 (N.D.N.Y. 2009).

Plaintiff disputes several aspects of the ALJ's hypothetical questions. First, plaintiff challenges the assumptions that she could "carry on a basic conversation in English" and could "make out forms and job applications and such." (Tr. 42.) Plaintiff notes that these assumptions

directly contradict answers she provided in her testimony
when asked about these precise capabilities. (Tr. 33-34.)
While plaintiff's objections in this regard are
understandable, we note that plaintiff did suggest that she
can understand a basic conversation in English, and she did
state that she can understand - at least to a fair degree -
articles in the New York Post.[8] (Tr. 32-33.) Given these
statements, along with our deference to credibility
assessments made by the ALJ, we conclude that there was
sufficient evidence in the record from which the ALJ could
have based the language assumptions.

However, we find that there was insufficient evidence
to support other aspects of the ALJ's hypothetical
questions. The ALJ told Cestar to assume that plaintiff
could lift and carry twelve pounds. (Tr. 42.) When later
asked by Cestar to clarify whether this assumption applied
to one hand or both hands, the ALJ stated that it should
apply to both. (Tr. 42.) Although the ALJ did not explain
the basis for this assumption, it would seem that the ALJ
relied on plaintiff's previous answer that she could carry
"five, ten, [or] twelve" pounds with her left hand. The ALJ
thus based his assumption entirely on the upper range of

---

[8] We also note that it appears that plaintiff filled out at least one of
her disability applications in English on her own. (Tr. 134-144.)

weight mentioned by plaintiff when providing a loose estimate of her capabilities <u>with her left hand only</u>. The ALJ completely disregarded plaintiff's testimony that she could not carry a gallon of milk with her right hand, and he disregarded the consistent medical evidence suggesting that plaintiff suffers from a condition that causes impairment of her right hand and wrist. There was simply no tangible evidence to support the assumption that plaintiff can lift and carry twelve pounds with her right hand.

The ALJ further neglected to include any consideration of plaintiff's mental conditions in his hypothetical questions. Although the ALJ ultimately concluded that plaintiff's mental impairments are not debilitating, the ALJ acknowledged that plaintiff suffers from "severe depression" and at least "mildly impaired" memory skills that may be related to symptoms of anxiety. (Tr. 17-18.) Psychological conditions such as these must be included in hypothetical questions asked of a vocational expert. <u>See</u> <u>Day</u>, 2011 WL 1467652, at *17; <u>Vernon v. Astrue</u>, No. 06 Civ. 13132 (RMB)(DF), 2008 WL 5170392, at *25 (S.D.N.Y. Dec. 9, 2008).

On remand, the ALJ must ensure that the hypothetical questions posed to the vocational expert take account of plaintiff's full range of impairments and are based only on

assumptions that are supported by substantial evidence. The questions may also need to incorporate any changes to plaintiff's RFC that result from reassessment of plaintiff's level of pain or from reconsideration of the opinions of Dr. Hanna and Dr. Freddo.

### CONCLUSION

For the reasons stated above, we remand the case for further administrative proceedings consistent with this opinion.

**SO ORDERED.**

Dated:    New York, New York
          December 20, 2011

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Order have been mailed on this date
to the following:

**Attorney for Plaintiff:**
Stephen M. Jackel, Esq.
277 Broadway, Suite 1010
New York, NY 10007

**Attorney for Defendant:**
Susan Baird, Esq.
United States Attorney Office
One St. Andrew's Plaza
New York, NY 10007